**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-01541-CMA-CBS

TURNKEY SOLUTIONS CORPORATION,

      Plaintiff,

v.

HEWLETT PACKARD ENTERPRISE COMPANY,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT
AND PLAINTIFF'S MOTION TO STRIKE AND ORDERING ADDITIONAL BRIEFING**

---

      This matter is before the Court on Defendant's Motions for Partial Summary Judgment (Doc. ## 134, 176) and Plaintiffs' Motion to Strike the rebuttal opinions of Defendant's expert, James Bach (Doc. # 183).  For the following reasons, the motions are denied.

## I.      <u>BACKGROUND</u>

      This case arises over a dispute between Hewlett Packard Enterprise Company (HPE) and TurnKey Solutions Corporation (TurnKey) over the proprietary nature of features of TurnKey's core product software, cFactory.  (Doc. # 147, p. 3; Doc. # 1, p. 1–3.)  cFactory is a program that tests on the functionality of complex enterprise software.  (Doc. # 1, p. 1, 3–4.)  HPE also offers software that assists in functional software testing, including United Functional Testing and Business Process Testing.

(Doc. # 147, p. 2.)  cFactory operates as an add-on to those, and other, HPE products.
(Doc. # 179, p. 2.)

On May 16, 2012, HPE and TurnKey entered into a Software License and
Distribution Agreement for Third Party Branded Products (OEM Agreement).  (Doc. # 1,
¶ 25.)  The OEM Agreement authorized HPE to "use, reproduce, display, distribute,
import, and disclose" various TurnKey software programs, in exchange for royalties and
subject to certain conditions, including confidentiality provisions.  (*Id.* at ¶ 26; Doc. #
136-1, p. 6–8, 14–15.)

In October 2014, at HPE's request, TurnKey hosted two web conferences
wherein TurnKey provided HPE with detailed information about the software portfolio
underlying cFactory.  (Doc. # 1, ¶ 40; Doc. # 134, p. 3.)  Later that year, HPE hosted a
conference in Spain where it presented its plans to launch a new version of its BPT
software — Version 12.5.  (Doc. # 1, ¶ 47.)  Various TurnKey conference attendees
became concerned that Version 12.5 incorporated several confidential features of
cFactory.  (*Id.*, ¶ 48; Doc. # 134, p. 3.)  TurnKey expressed those concerns to HPE, and
on March 5, 2015, HPE provided TurnKey with a private web demonstration of the
proposed Version 12.5.  (Doc. # 1, ¶ 57; Doc. # 134, p. 3–4.)  A TurnKey employee
recorded that demonstration.  (Doc. # 134, p. 4; Doc. # 147, p. 15–18.)

Shortly thereafter, TurnKey initiated this lawsuit alleging that HPE, in developing
Version 12.5, misused TurnKey's confidential software information.  (Doc. # 1.)
TurnKey also contends that HPE fraudulently induced TurnKey into disclosing that
information at the October 2014 conferences by falsely assuring TurnKey that HPE had

no intention of creating a product that competed with cFactory. (*Id.*) Based primarily on these allegations, TurnKey raises three claims for relief: (1) Misappropriation of Trade Secrets; (2) Breach of the OEM Agreement; and (3) Fraud. (*Id.*, p. 13–15.)

HPE denies TurnKey's allegations and requests that this Court grant summary judgment in its favor on all three claims. HPE also requests that the Court limit TurnKey's claims and damage award based on patent preemption and a presumption against the extraterritorial application of laws.

In addition, both parties have disclosed expert reports supporting their positions. Of import to this Order, TurnKey asserts that HPE's rebuttal report by expert James Bach is improper under Rule 26 and request that the Court strike it accordingly.

The Court addresses each of the parties' contentions in turn.

## II.    MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely on conjecture,

speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

## B.    MISAPPROPRIATION OF TRADE SECRETS

HPE contends that TurnKey's misappropriation claim fails as a matter of law because TurnKey has failed to identify any secrets relating to its software that would be entitled to protection.

1.  Law

The elements of a trade secret misappropriation claim are: "(i) that [TurnKey] possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that [HPE] knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus, Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). The Colorado Uniform Trade Secrets Act ("CUTSA")[1] defines a trade secret as

> scientific or technical information, design, process, procedure, formula, improvement . . . or other information relating to any business or profession which is secret and of value. To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4).

Factors considered in determining the existence of a trade secret include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990).

---

[1] The parties agree that Colorado law governs this claim.

"Indispensible to an effective allegation of a trade secret is proof that the matter is, more or less, secret." *Hertz v. Luzena Grp.*, 576 F.3d 1103, 1109 (10th Cir. 2009).

Trade-secret status is a question of fact for determination by the trier of fact. *Network Telecommunications, Inc. v. Boor–Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990); *see also Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (citing *Colo. Supply Co.*, 797 P.2d at 1306 ("Trade-secret status is a question of fact."); *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1011 (D. Kan. 2004) (trade secret conclusion is made after a "fact-intensive inquiry"); *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) (secrecy is a basic element of the factual inquiry); *Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449, 454 n. 4, 455 (10th Cir.1973) (what constitutes a trade secret is a question of fact for the trial court, not the appellate court); *Public Systems, Inc. v. Towry*, 587 So.2d 969, 972 (Ala. 1991) (same); *All W. Pet Supply Co. v. Hill's Pet Prod. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1433, 1437–38 (D. Kan. 1993) ("The existence of a trade secret under the Uniform Trade Secrets Act is a question of fact for determination by the trier of fact.").

2. Analysis

Having reviewed the pertinent filings and exhibits, the Court concludes that HPE has not met its burden of demonstrating the absence of a genuine dispute as to material facts governing TurnKey's trade secret misappropriation claim. For starters, the parties vehemently dispute two interrelated issues essential to the claim: (1) whether TurnKey

has adequately identified information that rises to the level of a trade secret, and (2) whether TurnKey adequately protected that information from public dissemination.

HPE argues that TurnKey has not identified *any* information about its software that it does not regularly disclose to its users and the public.  HPE states that TurnKey's trade secret descriptions "offer[] nothing more than the basic capabilities of cFactory, information that is self-revealing to anyone using the software for its intended purpose" and that is not, therefore, secretive.  (Doc. # 176 at 12.)  TurnKey, however, disagrees, stating that its "trade secrets are cFactory's underlying methodologies: sequential tasks it directs the computer running it to perform to produce the capabilities" that are ultimately viewed by the user — methodologies for which TurnKey has now received two U.S. method patents.  (Doc. # 179, p. 1.)  TurnKey's trade secrets are thus not cFactory's observable capabilities, but rather the underlying architecture of the software — the invisible tasks that the software performs to produce those capabilities.  In other words, in arguing that it has identified trade secrets, TurnKey highlights the "how," not the "what" of cFactory.  (Doc. # 179, p. 10; Doc. # 172-2, p. 36).

In so contending, TurnKey does not dispute that elements of its software are known to the public, such as the program's result — its output.  But, a plaintiff alleging misappropriation of a trade secret need not prove that every element of information in a compilation is unavailable elsewhere.  *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 738 P.2d 665, 675 (1987).  In determining the existence of trade secrets, courts do not look at individual components of a process, but the entirety of the process, as "a trade secret can include a system where the elements are in the public domain, but there has

been accomplished an effective, successful and valuable integration of [those] elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation." *Rivendell Forest Prods., Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir. 1994); *Innovatier, Inc. v. CardXX, Inc.*, No. 08-CV-00273-PAB-KLM, 2011 WL 3293789, at *2–3 (D. Colo. Aug. 1, 2011); *see also Servo Corp. of America v. General Elec. Co.*, 393 F.2d 551 (4th Cir. 1968) (trade secrets often contain elements that by themselves may be in the public domain, but together nevertheless qualify as trade secrets).

In any event, considering these arguments, the Court cannot, as a matter of law, determine whether TurnKey has adequately identified trade secrets to support its misappropriation claim. That material inquiry is engulfed in genuine dispute and its resolution should, therefore, be a function of the jury at trial.

## C. BREACH OF CONTRACT

HPE next contends that TurnKey's breach of contract claim fails as a matter of law because (1) TurnKey failed to properly designate the allegedly confidential information as "confidential" as required by Section 10.2 of the OPE Agreement; and (2) any claim that HPE's product is "similar to" or "competitive with TurnKey's software is precluded by Section 10.5 of the OEM Agreement. (Doc. # 134, p. 6–7.)

1. Contract Law[2] and The OPE Agreement

Generally, interpretation of a contract involves a legal inquiry conducted by the court. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). The court first looks at the language of the contract to ascertain its plain and ordinary meaning. *Id.* However, when a contract is in any of its terms or provisions ambiguous or uncertain, the parties should be afforded a full opportunity to produce evidence of the facts, circumstances, and conditions surrounding the contract's execution and the conduct of the parties relative thereto. *Walsh v. Walsh*, 18 Cal. 2d 439, 443 (1941). In other words, when the meaning of the language of a contract is uncertain or ambiguous, typically resulting in the introduction of parol evidence, the question of its meaning is one of fact for the trier of fact. *Scott v. Sun-Maid Raisin Growers Ass'n*, 13 Cal. App. 2d 353, 359 (1936).

As pertinent here, the OPE Agreement provides:

> 10.2 Confidential Information. During the term of this Agreement, either party may receive or have access to technical information, including without limitation source code, as well as information about product plans and strategies, promotions, customers and related non-technical business information which the disclosing party considers to be confidential and which is marked as confidential at the time of disclosure or which, if disclosed orally, is identified as confidential at the time of disclosure and is following within thirty (30) days of disclosure with a written memorandum so stating to the receiving party's Designated Recipient for Notice ("Confidential Information").

> 10.3 Protection of Confidential Information. The receiving party will protect any such Confidential Information of the disclosing party by using the same degree of care, but no less than a reasonable degree of care, to prevent the

---

[2] The parties agree that the OPE Agreement is governed by California law. (Doc. # 136-1, p. 49–50.)

unauthorized party uses to protect its own confidential information of like nature for a period of five (5) years from the date of disclosure, unless otherwise provided in this Agreement. . . . The foregoing restriction will not apply to any information which . . . is publicly known or readily ascertainable by proper means.

10.4 <u>LICENSOR Source Code</u>. HP agrees to treat any, source code, scripts, key-words, key-word libraries, and methodologies provided by LICENSOR hereunder as Confidential Information of LICENSOR under this Section 10 for a period of five (5) years following termination or expiration of this Agreement.

10.5 LICENSOR understands that HP designs, develops and acquires hardware and software for use with its own computer system products, and that existing or planned hardware or software independently developed or acquired by HP may contain ideas and concepts similar or identical to those contained in LICENSOR's Programs, Documentation, Sales Tools or Support and Build Tools. LICENSOR agrees that entering into this Agreement shall not preclude HP, in any way, from using such ideas and concepts to develop or acquire similar hardware or software for any purpose, subject to HP's compliance with its confidentiality obligations under this Section 10.

2. <u>Analysis</u>

   a. *Section 10.2*

As mentioned, HPE contends that Section 10.2 of the OPE required TurnKey to either label or orally designate (and then follow up with a memo) any information it deemed confidential before it could be rendered confidential under the OEP Agreement. HPE adds that TurnKey neither marked the information provided at the October conferences as "confidential" nor followed an oral disclosure with a written memorandum. Therefore, that information cannot form the basis of a claim for breach of confidentiality under the OEM.

TurnKey disputes HPE's interpretation of the OEM Agreement. TurnKey instead contends that Section 10.2 has to be read in conjunction with Section 10.4. According to TurnKey, Section 10.2 provides only that a party may receive confidential information, considered and labeled as such, from the other party. It does not, however, preclude other information from being considered confidential if it is not so labeled. Indeed, according to TurnKey, Section 10.4 references types of information that are *automatically* considered confidential, label or not.

This Court finds that reasonable juror could find either party's interpretation to be valid. On the one hand, Section 10.2 does not clearly foreclose the possibility that information not labeled "confidential" can still be deemed confidential under the OEM Agreement. The section references "technical information, . . . information about product plans and strategies, promotions, customers and related non-technical business information" and does not state that the party claiming this information confidential *must* or *shall* label it so to invoke the protections of the OEM Agreement. In addition, Section 10.4 plainly states that HPE agrees to treat "any, source code, scripts, key-words, key-word libraries, and methodologies" as confidential. That the allegedly misappropriated information constitutes a "methodology" is not in dispute.

On the other hand, Section 10.2 does imply that a "confidential" marking is necessary to signal that the disclosing party desires the material to be confidential. This reading would comport (1) with the second half of that provision — addressing oral disclosures — being interpreted as an alternative method of preserving confidentiality

and (2) with Section 10.4 being interpreted as merely extending the term of protection for certain categories of information.

Because the OEM Agreement is susceptible to two reasonable interpretations, its application should be assessed by the jury, after hearing additional evidence on the issue, including evidence related to the facts, circumstances, and conditions surrounding the contract's execution and the conduct of the parties relative thereto.

> *b. Section 10.5*

HPE also argues that Section 10.5 precludes TurnKey from bringing a breach of contract claim that is based on HPE's development of products that are similar to or overlap with TurnKey's products. Because TurnKey claims that BPT Version 12.5 is similar to cFactory, HPE argues that the claim is barred under Section 10.5. However, as TurnKey points out, HPE overlooks pivotal language from Section 10.5 that undermines its argument. First, Section 10.5 only applies to hardware or software "independently developed or acquired" by HPE. (Doc. # 136-1 p. 20.) Second, Section 10.5 is expressly "subject to [HPE]'s compliance with its confidentiality obligations under this Section 10." (*Id.* at 21.) Whether BPT Version 12.5 was independently developed by HPE and whether HPE breached Section 10's confidentiality provisions must be determined by a jury before any Section 10.5 limitations would operate to bar TurnKey's claims.

For the foregoing reasons, HPE's request for summary denial of TurnKey's breach of contract claim is denied.

**D.      FRAUD**

HPE contends that TurnKey's fraud claim fails as a matter of law because TurnKey did not reasonably rely on any alleged misrepresentations.  Disputed material facts are at the very heart of this contention.

As mentioned, TurnKey claims that HPE fraudulently induced TurnKey into divulging information about cFactory in October 2014 by falsely representing to TurnKey that it was not developing a competing software product.  HPE argues that no reasonable juror would conclude that TurnKey's reliance on HPE's alleged misrepresentations was reasonable because Section 10.5 authorizes HPE to develop products that overlap with TurnKey's products.  In other words, HPE contends that TurnKey necessarily *had to know* that HPE would develop a similar product to cFactory because the contract allows HPE to do so.  This argument is absurd.  First, as explained above, Section 10.5 does not so unconditionally allow.  Second, whether HPE lied to TurnKey to obtain more information about cFactory and "copy" it is undoubtedly a factual question that a jury must evaluate.

HPE's request for summary judgment on TurnKey's fraud claim is denied.

**E.      PATENT PREEMPTION**

HPE contends that TurnKey's trade secret misappropriation and breach of contract claims "cannot be based on any conduct by HPE occurring after [the] date" that TurnKey's patent application was published.  (Doc. # 134, p. 13.)  TurnKey agrees that the publication of its patent application in October 2015 rendered the information underlying this dispute publicly available, such that the information could no longer be

considered a trade secret after that date.  TurnKey also concedes that (1) it does not

bring suit against HPE for software or programs developed after October 2015 and (2) it

could not bring suit against HPE if it had acquired information about cFactory and

developed BPT Version 12.5 after October 2015.  However, TurnKey argues that its

present claims should not be summarily dismissed based on patent preemption

because TurnKey's allegations focus on HPE's conduct *before* October 2015, i.e. the

misappropriation of TurnKey's trade secrets in October 2014 and the subsequent

development of BPT Version 12.5 in July 2015.

 The Court agrees with TurnKey.  That TurnKey's patent application included the

material at issue here does not diminish the secrecy of that material during the period

*before* the patent application was published.  "Material in a patent application remains

secret unless and until it is published by the [United States Patent Office]."  *Innovatier,*

*Inc.*, 2011 WL 3293789, at *4.

 To the extent HPE is requesting that this Court limit TurnKey's damage award

based on the publication of the patent application, the Court declines to do so.  The

patent application does not necessarily absolve HPE of all post-publication damages

that flow from its alleged pre-publication misappropriation.  *Engelhard Indus., Inc. v.*

*Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir. 1963) ("[W]here, in advance

of the granting of a patent, an invention is disclosed to one who, in breach of the

confidence thus reposed, manufactures and sells articles embodying the invention, such

person should be held liable for the profits and damages resulting therefrom, not under

the patent statutes, but upon the principle that equity will not permit one to unjustly

enrich himself at the expense of another.")  Moreover, whether TurnKey is entitled to damages and how much to award in damages are questions for the jury following the presentation of evidence at trial.

The Court therefore denies HPE's request for summary judgment based on patent preemption.[3]

## F.  EXTRATERRITORIAL APPLICATION OF LAW

HPE next argues that any damages award based on HPE's sales outside of the United States would run afoul of the presumption against the extraterritorial application of law.  HPE thus "seeks judgment that any damages exclude non-U.S. conduct."  (Doc. # 134, p. 17.)

The presumption against the extraterritorial application of law reflects that United States laws govern domestically but do not rule the world; it serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) (internal citations and quotations omitted).  *Kiobel* and its progeny reflect a two-step framework for analyzing extraterritoriality issues.  The framework applies not just to identifying the conduct that will be deemed infringing but also to assessing the damages that are to be imposed.  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1306 (Fed. Cir. 2015).

---

[3] In its reply brief, HPE reshapes and narrows its summary judgment request.  Requests raised for the first time in a reply brief will ordinarily not be considered.  *United States v. Herget*, 585 F. App'x 948, 951 (10th Cir.  2014).  Moreover, because TurnKey readily agrees, and the Complaint reflects, that its misappropriation and breach of contract claims arise from HPE's conduct before October 2015, when the patent application was published, there appears to be no need, or basis, for the Court take further action on the issue.

At the first step, the Court asks whether the presumption against extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). The applicable law on this issue — the CUTSA — both in its regulation of conduct and assessment of damages — is silent on the issue of extraterritoriality. *See* Colo. Rev. Stat. § 7-74-102, 104. Accordingly, the Court moves to step two.

Second, the court determines whether the case involves a domestic application of the statute. *RJR Nabisco*, 136 S. Ct. at 2101.

> The court does this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*Id.* The focus of a claim under the CUTSA, i.e. the regulated conduct, is the misappropriation of a trade secret, defined as the "acquisition of a trade secret . . . by improper means" or the "disclosure or use of a trade secret" without consent. Colo. Rev. Stat. § 7-74-102(2). The focus of any resulting damage award also stems from the misappropriation: "Damages may include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Colo. Rev. Stat. § 7-74-104(1).

TurnKey contends that the October 2014 conferences, where the acquisition allegedly occurred, took place in Colorado and that the HPE representatives participating in the conferences were also in Colorado. Indeed, according to TurnKey,

"a substantial part of the events giving rise to [its] claims occurred in Colorado" and HPE's conduct will cause TurnKey financial injury in Colorado. (Doc. # 1, ¶¶ 4–5.) If true, any damage award flowing from HPE's domestic misappropriation would not run afoul of the presumption against the extraterritorial application of law. This Court, or rather the jury at trial, would simply be assessing damages based on a domestic legal violation that would not interfere with any international laws, even if some of the damage award was assessed based on HPE's international sales. *See RJR Nabisco*, 136 S. Ct. at 2101 (a case can involve a permissible domestic application of law even if some of the conduct involved occurred abroad).

HPE however denies that the alleged misappropriation occurred in Colorado — stating TurnKey cannot prove "that *any* HPE representatives who allegedly 'acquired' TurnKey's trade secrets at the October briefings, or *any* of the software developers who allegedly used TurnKey's trade secrets by incorporating them into the accused products, were in Colorado." (Doc. # 151, p. 8) (emphasis in original). Although adamant that no misappropriation occurred in Colorado, HPE provides this Court with no alternate facts or argument to support that the alleged misappropriation could have occurred *abroad*.

In any event, the parties' disagreement highlights a genuine issue of disputed fact at the heart of this analysis — where the conduct regulated by the statute occurred. Because of this dispute, summary judgment limiting TurnKey's recovery based on the presumption against the extraterritorial application of laws is improper at this time. HPE's request is thereby denied.

## G.    HPE'S UNLAWFUL RECORDING COUNTERCLAIM

Finally, HPE requests that the Court grant summary judgment in its favor on its unlawful recording counterclaim, brought under Cal. Penal Code §§ 630 *et seq.*, because, according to HPE, it is undisputed that the TurnKey employee who recorded the March 5th demonstration did so without the consent of HPE participants, as required under California law.  TurnKey disagrees, arguing that (1) Colorado law applies and only requires that one party consent to the recording, and (2) even if California law applies, TurnKey alleges that the TurnKey employee did have the consent of an HPE representative.

These facts give rise to a classic choice-of-law issue.  As the basis of the Court's subject matter jurisdiction over this case is diversity of citizenship, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), mandates that this Court apply the choice-of-law rules of the forum state, which in this case is Colorado.  *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Telectronics, Inc. v. United Nat'l Ins. Co.*, 796 F.Supp. 1382, 1389 (D.Colo. 1992).  Colorado has adopted the Restatement (Second) choice-of-law approach for tort actions.  *Wood Bros. Homes v. Walker Adjustment Bureau*, 198 Colo. 444, 447 (1979).  Under Restatement (Second) § 145, the law of the state with the most significant relationship to the occurrence and the parties governs a tort action.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 508 (Colo. 2007).  However, the Restatement (Second) also contains a specific section for right to privacy actions.  Restatement (Second) § 152 provides

> In an action for an invasion of a right of privacy, the local law
> of the state where the invasion occurred determines the

> rights and liabilities of the parties, except as stated in § 153,
> unless, with respect to the particular issue, some other state
> has a more significant relationship under the principles
> stated in § 6 to the occurrence and the parties, in which
> event the local law of the other state will be applied.

Whether "some other state has a more significant relationship" typically turns on whether some state has a greater interest in the determination of the particular issue than the state where the invasion of the right of privacy occurred. Restatement (Second) § 152, cmt. b.

In as much as neither party did an adequate job of briefing this issue, the Court declines to decide what state's law applies to HPE's unlawful recording claim until further briefing is submitted which addresses both § 152 of the Restatement (Second) and which state's interest is greater in this case. The parties shall submit simultaneous briefing on this issue by August 16, 2017.

In any event, the Court need not decide the choice-of-law issue at this time because, regardless of which law governs, summary judgment is not warranted. If Colorado law governs, HPE's consent was not required and summary judgment would not, therefore, enter in HPE's favor. Even if California law governs, summary judgment is likewise inappropriate because there are disputed issues of fact regarding the elements of HPE's counterclaim. Accordingly, HPE's motion for summary judgment as to its unlawful recording counterclaim is denied.

### III.  MOTION TO STRIKE EXPERT OPINION OF JAMES BACH

Plaintiff requests that the Court strike the rebuttal opinions of expert James Bach as being beyond the scope of TurnKey's expert disclosure in violation of Federal Rule of

Civil Procedure 26(a)(2)(D)(ii), which permits the disclosure of rebuttal expert testimony "on the same subject matter identified by another party" in its opening expert report. For the following reasons, the Court denies the motion to strike.

On January 3, 2017, TurnKey designated Dale Ellis, a TurnKey employee and Chief Technology Officer, as its technical expert and served an expert disclosure on HPE pursuant to Rule 26(a)(2)(C). That disclosure states, in pertinent part, that Mr. Ellis would present evidence on:

- Technical overlap between HPE's BPT and cFactory, and

- Whether the technical overlap between BPT and cFactory and "the circumstances of HPE's development of BPT, including its acquisition of confidential information of TurnKey, suggest use by [HPE] of TurnKey's confidential information in [HPE's] development of BPT version 12.50 or higher versions."

The summary to the disclosure adds "it is Mr. Ellis's opinion that [HPE] used the confidential information that TurnKey provided to [HPE] in October 2014 in its design and development of BPT [Version 12.5], in part by incorporating TurnKey's confidential methodologies into BPT [Version 12.5] and integrating its competitive technology . . . ."

The disclosure further states that Mr. Ellis may testify concerning the facts set forth in TurnKey's "Supplemental Response to HPE's Interrogatory No. 4, which response is incorporated into this disclosure." (Doc. # 183-1.) TurnKey's supplemental response to Interrogatory No. 4 set forth all of the "facts [that] support TurnKey's

contention that [HPE] misappropriated the Trade Secrets through acquisition by improper means."  (Doc. #149-1, p. 51.)

In response to this disclosure, HPE served TurnKey with Mr. Bach's rebuttal report on February 3, 2017.  (Doc. ## 183-3, 183-4.)  TurnKey primarily objects to the portions of that report where Mr. Bach analyzes TurnKey's alleged trade secrets and concludes that none of them qualify for trade secret protection.  TurnKey argues that these opinions go beyond Mr. Ellis's disclosure because he "did not . . . offer any opinions about whether TurnKey's confidential information satisfies the legal requirements for trade secret protection."  (Doc. # 183, p. 5.)

Under Rule 26(a)(2)(D)(ii), the Court finds that Mr. Bach's rebuttal presents his opinions on the "same subject matter" identified by Mr. Ellis.  Essentially, TurnKey disclosed that Mr. Ellis would discuss, among other matters, the alleged misappropriation by HPE — a misappropriation which, at the very least implies, and at most concludes, the existence of legally-protectable trade secrets.  Mr. Bach's rebuttal opinions addressing those trade secrets and the alleged misappropriation are not, therefore, beyond the scope of Mr. Ellis's disclosure.  Thus, TurnKey's request that the Court strike Mr. Bach's opinions as in violation of Rule 26(a)(2)(D)(ii) is denied.

## IV. <u>CONCLUSION</u>

Accordingly, the Defendant's Motions for Partial Summary Judgment (Doc. ## 134, 176) and Plaintiff's Motion to Strike the rebuttal opinions of James Bach (Doc. # 183) are DENIED.  It is

FURTHER ORDERED that the Parties shall submit simultaneous briefing on the choice-of-law issue with regard to HPE's unlawful recording counterclaim — as set forth above in Part II.G.  The Parties' briefs are due by August 16, 2017.

DATED:  August 9, 2017                    BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge