IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 15-cv-01541-CMA-MLC

TURNKEY SOLUTIONS CORPORATION,

    Plaintiff,

v.

HEWLETT PACKARD ENTERPRISE COMPANY,

    Defendant.

---

## ORDER ON DEFENDANT'S RULE 702 MOTIONS

---

This matter is before the Court on two Rule 702 Motions filed by Defendant Hewlitt Packard Enterprise Company's (HPE) in which it requests the exclusion of testimony by experts Dale Ellis and Mark Pedigo. (Doc. ## 216, 219.) Having thoroughly reviewed the parties briefing and relevant legal authority, for the reasons set forth below, the Court (1) denies HPE's request to exclude Mr. Ellis's testimony but cautions that TurnKey must lay the proper foundation supporting his opinions at trial; and (2) denies Defendant's request to exclude Mr. Pedigo's reasonable royalty damage testimony because it appears to be the product of reliable principles and methods.

## I. BACKGROUND AND RULE 702 PRINCIPLES

Plaintiff Turnkey Solutions Corporation (Turnkey) initiated this lawsuit in July 2015, alleging that HPE used Turnkey's confidential design methodologies to develop competing products. TurnKey specifically contends that HPE misappropriated key scriptless, automation features of TurnKey's core product cFactory and incorporated those features into HPE's Business Process Testing (BPT), versions 12.5 and 12.5x. (Doc. ## 1 at 1–3; 223 at 3.) TurnKey further claims that HPE misappropriated its trade secrets for resale to SAP, a multinational technology company, in violation of TurnKey's and HPE's contractual arrangement, and that HPE's misappropriation cost TurnKey millions of dollars in direct sales and potential royalty payments. (Doc. # 223 at 2–3.) Stemming primarily from these allegations, TurnKey brings three claims for relief: Misappropriation of Trade Secrets; Breach of Contract; and Fraud. (*Id.* at 13–15.) The Parties are set for nine-day jury trial, to begin on February 12, 2018.

Turnkey has designated two experts to testify at trial: Dale Ellis, TurnKey's Chief Technology Officer; and Mark Pedigo, TurnKey's damages expert. For the testimony of these experts to be admissible, TurnKey must establish that the experts are qualified "by knowledge, skill, experience, training, or education" and that their "scientific, technical, or other specialized knowledge" (1) will help the trier of fact to understand the evidence or to determine a fact in issue; (2) is based on sufficient facts or data; and (3) is the product of reliable principles and methods. Fed. R. Evid. 702. Simply put, a qualified expert's testimony must be "reliable" and "relevant." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993). This Court must act as a gatekeeper and

exclude testimony that does not meet these requirements. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

## II. DALE ELLIS

Dale Ellis is TurnKey's founder and Chief Technology Officer, disclosed as an expert in the fields of software development and software test automation. (Doc. # 221 at 1.) Mr. Ellis intends to testify regarding:

1. The process by which companies develop software, in particular software for automating the testing of software applications;

2. Technical overlap between HPE's BPT and cFactory; and

3. Whether the technical overlap between BPT and cFactory and "the circumstances of HPE's development of BPT, including its acquisition of confidential information of TurnKey, suggest use by [HPE] of TurnKey's confidential information in [HPE's] development of BPT version 12.50 or higher versions."

(Doc. # 219-1 at 1–2.)

TurnKey's expert disclosure (the Ellis Disclosure) also states that Mr. Ellis may testify concerning the facts set forth in TurnKey's "Supplemental Response to HPE's Interrogatory No. 4, which response is incorporated into this disclosure." (Doc. # 219-1 at 3.) TurnKey's supplemental response to Interrogatory No. 4 sets forth all of the "facts [that] support TurnKey's contention that [HPE] misappropriated the Trade Secrets through acquisition by improper means." (Doc. #149-1, p. 51.) The Ellis Disclosure

further lists fifteen "assumptions" that Mr. Ellis relied upon in reaching his conclusions. (Doc. # 219-1 at 3.)

HPE lodges several objections to this proposed testimony—all of which essentially challenge the foundation supporting Mr. Ellis's opinions, i.e. whether they are based on actual knowledge, not "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (1993). HPEs objections can be grouped into two main categories: (1) Mr. Ellis's proposed testimony contains improper speculative commentary on HPE's state of mind, and (2) Mr. Ellis plans to deliver an improper recitation of facts supporting TurnKey's narrative of this case.

### A. STATE OF MIND TESTIMONY

HPE first contends that much of Mr. Ellis's disclosed testimony is improper commentary on HPE's state of mind—particularly as it relates to HPE's internal development of BPT 12.5x, a development process about which Mr. Ellis has no direct knowledge.

In so arguing, HPE relies heavily on *Pritchett v. I-Flow Corp.*, wherein the court excluded a plaintiff's expert's proposed testimony about the defendant's state of mind during its process of compliance with federal regulation standards. No. 09-CV-02433-WJM-KLM, 2012 WL 1059948 (D. Colo. Mar. 28, 2012). The court found that the expert was not qualified to offer such opinions because she was not employed by the defendant or the federal regulatory agency during the applicable timeframe; had no direct knowledge of the regulatory review and approval process; and her opinion did not derive from any research or experience outside the subject litigation. *Id.* at *6–7.

4

Here, however, Mr. Ellis, although not employed by HPE, is offered as an expert on the industry standards governing software development based in part on his twenty-eight years of experience in the test automation software industry (including during the relevant time period), his formal training and education regarding software development, and his receipt of two U.S. Patents for software test automation methods. From that vantage point, TurnKey argues that Mr. Ellis is expected to compare HPE's process of developing BPT 12.5x to the industry standards and practices governing software development, including the development of competing products and common signs of infringement. TurnKey suggests that Mr. Ellis's knowledge of HPE's process is derived from not only his review of documentary evidence in this case but also his company's interactions with HPE during that process—including via joint meetings and email exchanges.

Provided that an adequate foundation is laid as to Mr. Ellis's expertise in the area of software development and his observations of HPE's BPT software development process in comparison to the ordinary practices and usages in the industry, the Court sees no reason to exclude his opinions. However, to the extent Mr. Ellis begins to improperly speculate about HPE's motivations, intent, or state of mind, the Court agrees with HPE that such speculation is not contemplated by Rule 702 and should be excluded. In other words, Mr. Ellis cannot speculate as to HPE's employee's motive or intent, but he can testify about facts and his observations from which the jury can then infer motive or intent. *See Wells v. Allergan*, Inc., No. CIV-12-973-C, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (making the same distinction); *DePaepe v.*

*Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (holding an engineer could testify *as an expert* "that reducing the padding saved a particular amount of money ... [and] that [the manufacturer's] explanation for the decision was not sound; but he could not testify *as an expert* that [the manufacturer] had a particular motive"). Mr. Ellis may also explain to the jury the meaning, based on his experience in the industry, of "technically-worded" communications or documents that the jury will not necessarily understand without his assistance. *See Summit Elec. Supply Co., Inc. v. Int'l Bus. Machines Corp.*, No. CIV 07-431 MCA/DJS, 2010 WL 11414471, at *7 (D.N.M. Sept. 30, 2010) (allowing an expert to testify to the meaning of an email "as it would normally be understood by computer industry professionals" but not regarding "what the particular recipients of the email believed or internalized.").

With this distinction in mind, the Court denies HPE's request that the Court exclude portions of Mr. Ellis's proposed testimony in advance of trial. If, however, the proper foundation is not laid for his opinions or Mr. Ellis departs from an analysis of the facts and enters the realm of speculation, HPE may renew its objections.

### B. RECITATION OF TURNKEY'S CASE NARRATIVE

The Court next addresses HPE's objections to Mr. Ellis's proposed testimony about (1) the fifteen assumptions listed in the Ellis Disclosure and (2) the facts set forth in TurnKey's Supplemental Response to HPE's Special Interrogatory No. 4. HPE is concerned that expert testimony about these alleged facts will improperly assume the role of TurnKey's advocate and invade the province of the jury.

With respect to the fifteen assumptions, the disclosure clearly states that "Mr. Ellis will assume that the evidence will establish" them. (Doc. # 219-1 at 2). It is unclear which witnesses will testify as to these matters, but the Court notes that Mr. Ellis is both a fact witness and an expert witness. (Doc. # 193 at 16, 35.) The Court denies HPE's request for exclusion of any testimony related to the fifteen assumptions at this juncture. If, however, the proper foundation is not laid for Mr. Ellis's reliance on certain facts, HPE may renew its objection under Rule 702.

With respect to HPE's concern that TurnKey will merely "use Mr. Ellis as a spokesperson" to narrate its case-in-chief as set forth in TurnKey's lengthy Response to Special Interrogatory No. 4, TurnKey states that it has no intention of having Mr. Ellis simply regurgitate those facts, read its narrative of the case into the record, or recite TurnKey's Supplemental Response to HPE's Interrogatory No. 4 under the guise of expert opinion. (Doc. # 224 at 1–2, 12.) Accepting this concession, the Court sees no reason to exclude Mr. Ellis's proposed testimony. However, the Court cautions that an expert "may not simply rehash otherwise admissible evidence about which he has no personal knowledge," and "must do more than simply constructing a factual narrative based upon record evidence or address[ing] lay matters which a jury is capable of understanding and deciding without the expert's help." *Wells v. Allergan, Inc.*, No. CIV-12-973-C, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (internal citation omitted). To the extent Mr. Ellis appears to be inappropriately regurgitating facts at trial, rather than using relevant facts as context for his expert opinions, HPE may renew its objections.

## III.  MARK PEDIGO

Mark Pedigo, TurnKey's damages expert, offers two primary opinions: TurnKey's lost profit damages are $3.7 million and TurnKey's reasonable royalty damages range between $20 million and $52 million.  HPE objects to the latter opinion on royalty damages as not being the "product of reliable principles or methods" or "based on sufficient facts or data."  (Doc. # 218 at 1.)

The most common method for calculating reasonable royalty damages, and the method used by Mr. Pedigo, is the hypothetical negotiation approach.  This approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  This approach tries to recreate an *ex ante* licensing negotiation scenario and to describe the resulting agreement.  In other words, the hypothetical approach considers what might have occurred without the infringement and how "willing parties would have executed a license agreement specifying a certain royalty payment scheme." *Id.* at 1325.  Because the analysis is hypothetical, it "necessarily involves an element of approximation and uncertainty." *Unisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed.Cir. 1995).  The ultimate calculation is generally based on four components: a hypothetical negotiation date, payment method, royalty base (the sales of the infringing product that are subject to a royalty), and royalty rate (the amount owed per sale).

With respect to these four factors, Mr. Pedigo

1. selected a date in early October 2014, just before October 7, 2014, when, allegedly, TurnKey first exposed HPE to its confidential trade secrets (Doc. # 218-1 at 22);

2. applied a royalty payment scheme based on a "lump-sum payment" method with respect to a hypothetical SAP resale and a "running payment" method as applied to direct sales (*Id.* at 22);

3. calculated the royalty base sales to be 16,445 (*Id.* at 24); and

4. assessed a royalty rate ranging between $1000 and $2600 (*Id.* at 48).

Multiplying the royalty base by the royalty rate under the "running payment" method, Mr. Pedigo calculated a reasonable royalty direct sale damages figure ranging from $16,445,403 to $42,758,048. (*Id.* at 50.) Using the "lump-sum payment" method, Mr. Pedigo then calculated a reasonable royalty SAP resale damages figure ranging from $3.7 million to $9.2 million. (*Id.* at 50.) Adding these damage figures together, Mr. Pedigo concluded that TurnKey's total reasonable royalty damages range from $20,145,403 to $51,958,048, not including prejudgment interest. (*Id.*)

### A. THE ENTIRE MARKET VALUE

HPE objects to Mr. Pedigo's entire opinion, primarily arguing that Mr. Pedigo improperly applied the entire market value rule (EMVR), which applies in limited circumstances.

In general, when a plaintiff claims damages based on the infringement of certain components to a multi-component product, the plaintiff must attempt to separate out the

infringing components of the product, rather than assessing damages related to the product as a whole. As the Supreme Court long ago explained, a plaintiff

> must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.

*Garretson v. Clark*, 111 U.S. 120, 121 (1884).

A plaintiff may, however, assess damages based on the entire market value of the accused product as a whole, i.e. applying the EMVR, where "the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed.Cir. 2013). "It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [overall product]." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed.Cir. 2012). Instead, "a reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed.Cir. 2010). The EMVR therefore requires "proof that damages on the un[infringed] components or technology is necessary to fully compensate for infringement of the [entire] invention." *Cornell Univ. v. Hewlett–Packard Co.*, 609 F.Supp.2d 279, 285 (N.D.N.Y. 2009). In the absence of such a showing,

principles of apportionment apply. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

HPE alleges that Mr. Pedigo relied on the EMVR without demonstrating that the allegedly misappropriated features drove the demand for BPT 12.5x. In response, TurnKey contends that (1) Mr. Pedigo did not apply the EMVR, and (2) even if he did, Mr. Pedigo cites ample evidence to support that the infringing features of BPT 12.5x drove its demand and compensation should be based on the market value of the entire product.

It is unclear to this Court whether Mr. Pedigo applied EMVR to his reasonable royalty calculation. As HPE points out, Mr. Pedigo testified, "I believe I came up with the [royalty rate] conclusion based on the entire market value of the product." (Doc. # 234-1 at 3.) But, Mr. Pedigo also testified that he attempted to apportion the royalty rate based on the trade secrets at issue in this case. (*Id.* at 2.) In his report, Mr. Pedigo explains that he applied the EMVR to his reasonable royalty rate calculation, assuming that TurnKey would "establish that the trade secrets at issue substantially create[d] the value of cFactory and . . . BPT 12.5x." (Doc. # 218-1 at 48). In the very next paragraph, however, Mr. Pedigo apportioned the infringing features of BPT 12.5x to lower his royalty rate by 40% to account for "trade secret related improvements." It appears, therefore, that Mr. Pedigo applied both the EMVR method and an apportionment approach. The Court cannot therefore agree with TurnKey that his royalty rate did not implicate EMVR.

In any event, the Court finds that Mr. Pedigo's use of the EMVR was not improper. Mr. Pedigo acknowledged that use of the EMVR was permitted only if the "trade secrets at issue created the basis for customer demand or substantially created the value of the component parts." (Doc. # 218-1 at 48.) Mr. Pedigo's report then references substantial evidence to support that the alleged trade secrets drove demand for BPT 12.5x, including:

- HPE faced a risk of declining revenue if it did not develop a test automation framework;
- HPE noted in a presentation that its creation of a test automation framework would be a strategic control point to quadruple its sales.
- HPE's old version of BPT (without the allegedly infringing features) had complexity and usability issues, primarily related to its lack of an automation framework and a scriptless gap.
- HPE noted in a presentation that an investment in scriptless testing was necessary because of the significant market opportunity and definite customer need for the solution.
- HPE projected large revenues for the resale of automation software to SAP ranging from $58.2 million to $74.9 million.

(Doc. # 218-1 at 41). Mr. Pedigo also assumed that TurnKey would establish the veracity of these facts at trial. Based on this, and other, information set forth in Mr. Pedigo's report, it is clear that he considered and analyzed whether BPT 12.5x's infringing automation features drove its demand. Mr. Pedigo's use of the EMVR does

12

not therefore render his opinion unreliable or faulty under Rule 702 and the Court declines to exclude it on that basis. In so concluding, the Court takes no position on whether the above-listed statements are accurate or believable; indeed, Mr. Pedigo's credibility and the weight to be given his opinion is for the jury to assess, not this Court.

### B. THE ROYALTY BASE

HPE also challenges Mr. Pedigo's reasonable royalty base determination, which he based on (1) the quantity of HPE's direct sales (2,954) and (2) the number of BPT customer upgrades (13,491). HPE specifically contends that Mr. Pedigo's inclusion of upgrades into the royalty base is improper because the upgrades stem from sales that pre-date the alleged misappropriation and are not adequately linked to the infringing product to support including them in a hypothetical royalty calculation. Thus, Mr. Pedigo's royalty base is "not based on sufficient facts or data." (Doc. # 218 at 10.)

TurnKey responds that the upgrades are, indeed, sufficiently linked to the infringing product to support including them in the royalty calculation. TurnKey explains that Mr. Pedigo relied on HPE's records suggesting that the vast majority of HPE's revenue stems not from sales, but from upgrades, which HPE customers must elect and pay to receive. *See LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 190 (S.D.N.Y. 2002) ("A reasonable royalty may also be based on the infringer's profits.") For example, many of HPE's largest BPT customers, including JP Morgan, Chase Bank, Liberty Mutual, and Spring, only have one BPT license that entitles them to product upgrades. (Doc. # 218-1 at 22.) TurnKey also points to evidence suggesting that HPE always intended for HPE's customers to receive BPT 12.5x via upgrade, not direct sale,

13

and that HPE always encourages its customers to install the latest and greatest HPE products through upgrades, not through new product purchases. *See LinkCo, Inc.*, 232 F. Supp. 2d at 188–89.

Having thoroughly considered the issue, the Court agrees with TurnKey that upgrades were properly linked to the infringing product and relevant to Mr. Pedigo's hypothetical negotiation method. Their inclusion, therefore, does not render Mr. Pedigo's royalty base calculation unreliable or lacking in sufficient facts or data under Rule 702, and the Court denies HPE's request for exclusion on these grounds.

### C. THE ROYALTY RATE

HPE further objects to Mr. Pedigo's determination of the reasonable royalty rate—a rate which he determined after thoroughly analyzing the fifteen well-known factors derived from *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). Those factors were designed to incorporate all relevant practical and economic considerations that may have come into play in the parties' hypothetical royalty negotiation. *Id.* They include considerations of the royalties previously received by the plaintiff for the licensing of the trade secret to others; the nature and scope of the license of the infringing product; the commercial relationship between the parties; the effect of selling the trade secret product in promoting sales of other products of the defendant; the extent to which the defendant has made use of the trade secret; the established profitability of the trade secret; and amount that plaintiff and defendant may have reasonably agreed upon. *See LinkCo, Inc.*, 232 F. Supp. 2d at 192 at n.7.

HPE does not specifically object to Mr. Pedigo's analysis with respect to any of the fifteen *Georgia-Pacific* factors. Instead, HPE argues for the exclusion of Mr. Pedigo's royalty rate and ultimate royalty damage calculation because he failed to account for the law of supply and demand—that is, according to HPE, he failed to consider that HPE may have sold fewer BPT 12.5x products had they been priced above the $1,168 actual price to account for Mr. Pedigo's hypothetical royalty rate.

In support, HPE relies on several cases, including *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001), and *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 1002 (N.D. Ill. 2014). The plaintiffs in those cases, however, sought to recover lost profits based on a theory of price erosion; naturally, then, the specific effect of a change in price on the demand for the product was central in each case. A reasonable royalty calculation, like the one done by Mr. Pedigo, does not *depend* on a consideration of the law of supply and demand, and the cited cases do not, therefore, bind him to that approach.

The Court recognizes that, in some reasonable royalty cases, courts have nonetheless frowned upon an expert's failure to account for the law of supply and demand, particularly when the expert's report is riddled with other issues or when the expert concludes that royalty rate would triple or quadruple the sales price of the infringing product. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1155 (N.D. Cal. 2007) (rejecting an expert's opinion based on multiple unreliable conclusions, including the expert's hypothesis that "a royalty that would triple the average selling price for MPS' accused products" and then failure to calculate "the

15

impact that increased prices would have had on demand."); *02 Micro Int'l LTD. v. Beyond Innovation Tech.*, No. CIVA 2:04-CV-32, 2005 WL 6440628, at *3 (E.D. Tex. Dec. 15, 2005) ("Absent evidence at trial that the market would have accommodated [the expert's assumed] $4.00 selling price [as opposed to the $1.00 actual price], the damages model may lack the sound economic and factual predicates necessary to justify its consideration by the jury.").

However, in this case, Mr. Pedigo has not hypothesized or concluded that BPT 12.5x's actual sales price would have been different following the parties' hypothetical negotiations. Although he stated HPE "may have been able to increase its prices to account for the royalty," he did not *conclude* that HPE's BPT 12.5x prices would have necessarily increased or factor any such increase into his royalty rate. And this Court is not required or even permitted to impute such a consideration or conclusion into his analysis. Thus, under the specific circumstances presented here, Mr. Pedigo's failure to strictly construe the laws of supply and demand—laws that were arguably irrelevant to his analysis—does not render his entire opinion unreliable or faulty under Rule 702, particularly considering that he was developing calculations based on fifteen well-developed economic and practical considerations that naturally rely on "approximation and uncertainty." *Unisplay S.A.*, 69 F.3d at 517.

Accordingly, the Court denies HPE's request to exclude Mr. Pedigo's reasonable royalty damages calculation on these grounds.

## D. DOUBLE-COUNTED DAMAGES

Last, the Court addresses HPE's contention that Mr. Pedigo's reasonable royalty damages calculation improperly includes HPE's direct sale royalties *and* its SAP resale royalties, resulting in a figure that improperly double counts HPE's sales and should, therefore, be excluded. TurnKey concedes this error in its response, attributing it to a misunderstanding of HPE's financial documents. TurnKey then states that Mr. Pedigo plans to adjust his testimony at trial to account for the error. HPE nonetheless argues that (1) the adjusted figures are also unreliable, and (2) even if they were reliable, Mr. Pedigo should not be permitted to testify to them pursuant to Federal Rule of Civil Procedure 32(c)(1) because the deadline for supplementing an expert report "has long passed." (Doc. # 234 at 9–10.)

The Court finds that Mr. Pedigo's proposed adjusted figures appear sufficiently reliable to overcome exclusion under Rule 702. Instead of adding the direct sale royalties to the SAP resale royalties, TurnKey states that Mr. Pedigo will instead use the two numbers to create a range of potential royalties. Essentially, the damages figure will be no lower than the SAP resale royalty range ($3.7 million to $9.2 million) and no higher than the direct sale royalty range ($16,445,403 to $42,758,048). That Mr. Pedigo applied different forms of payment to different aspects of this royalty range does not render his calculations per se unreliable, and HPE provides no case law to support its

17

contention that it does.[1]  Moreover, because the figures are no longer being added, it is unclear to this Court how HPE can still argue the existence of a double-counting issue.

The Court also finds that excluding Mr. Pedigo's opinion under Rule 37(c)(1) is not warranted in this case.  Rule 37(c)(1), provides, "If a party fails to provide information or identify a witness . . . , the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Although it appears that Mr. Pedigo could have adjusted his report as soon as he realized the error, the Court, in its broad discretion, declines to exclude his testimony.  *Woodworker's Supply, Inc. v. Principal Mt. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (the determination of whether to exclude a witness is entrusted to the broad discretion of the court).  Mr. Pedigo admitted his error and discussed the adjusted figures in his deposition which occurred on February 28, 2017—figures which have been reiterated in TurnKey's December 2017 Response to the instant 702 Motion.  HPE cannot, therefore, legitimately claim surprise.  Moreover, HPE has a corresponding expert who has had ample knowledge of Mr. Pedigo's error, has prepared a report so stating, and has been listed as HPE's will-call expert since at least July 2017.  Moreover, the Court has a strong preference for allowing cases to be decided on their merits, rather than limiting the presentation of testimony based on procedural issues if there has been no ensuing prejudice.

---

[1] HPE cites to *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012), for the proposition that lump sum payments "should not support running royalty rates without testimony explaining how they apply to the facts of the case."  However, that case does not support exclusion here, where Mr. Pedigo has proffered substantial explanation for why and how both payment methods apply to the facts of this case.

HPE's request to exclude Mr. Pedigo's testimony based on his double-counting error is therefore denied.

## IV. CONCLUSION

Accordingly, the Court DENIES HPE's 702 Motion to Exclude Testimony by Dale Ellis (Doc. # 219) and HPE's 702 Motion to Exclude Testimony by Mark Pedigo (Doc. # 216), with the understanding that Mr. Pedigo will adjust his reasonable royalty damages calculation as discussed in Part III.D above.

DATED: January 26, 2018　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　　　CHRISTINE M. ARGUELLO
　　　　　　　　　　　　　　　　　　　　United States District Judge